UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. MOMMA HAWK, individually, and as )
President of Recovering the Gifted Child, )
a not-for-profit corporation, and )
RECOVERING THE GIFTED CHILD, a )
not-for-profit corporation, )
)
        Plaintiffs, )
)
        v. )    **No. 04 C 4263**
)
BOARD OF EDUCATION OF THE CITY OF )    **Judge Rebecca R. Pallmeyer**
CHICAGO, a corporation, ARNE DUNCAN, )
CEO, MIKE VAUGHN, MARGARET OLAWOYE, )
SHIRLEY EWING, JAMES CIESIL, AND OTIS )
DUNSON, individually, and as agents of )
the Board of Education of the City of )
Chicago, )
)
        Defendants. )

## MEMORANDUM OPINION AND ORDER

Dr. Momma Hawk ("Plaintiff") was employed by Defendant Board of Education for the City of Chicago ("the Board") for almost thirty years until her dismissal in 2003. This lawsuit is the result of that dismissal and events surrounding it, all of which occurred between August 2001 and June 2003; during this time period, Plaintiff was serving as interim principal of Paderewski Learning Academy ("Paderewski"), a Chicago Public School ("CPS"), and director of Recovering the Gifted Child Academy ("RGCA"), a program founded by Plaintiff and operated out of Paderewski during the time Plaintiff served as its interim principal. During the same time period, Plaintiff also directed the operations of Plaintiff Recovering the Gifted Child Foundation ("RGCF"), an organization that provided some funding to RGCA and worked to address the broader needs that must be met for children to succeed in school such as food, shelter, and clothing.[1]

In this action, Plaintiff sues the Board; Defendant Arne Duncan, the Chief Executive Officer for

---

[1]      Counts I-IV are brought only by Dr. Hawk and not Recovering the Gifted Child Foundation ("RGCF"); Count V is brought by both Plaintiffs. When the court refers to "Plaintiff" in this opinion, it is always referring to Dr. Hawk.

CPS; and Defendant Mike Vaughn, a spokesman for CPS, under 42 U.S.C. § 1983 for deprivation of liberty in violation of the Fourteenth Amendment to the United States Constitution (Count I). Plaintiff also raises a number of state law conspiracy claims against other Board employees—Shirley Ewing, Margaret Olawoye, James Ciesil, and Otis Dunson—and alleges that they conspired to have her terminated in violation of 720 ILCS 5/8-2 (Count II), to intentionally inflict emotional distress (Count III), and to interfere with Plaintiff's employment relationship in violation of 720 ILCS 5/8-2 (Count IV). Finally, both Plaintiffs sue for replevin under 735 ILCS 5/19-104 to recover property that the Plaintiffs claim is being wrongfully retained by the Board (Count V). Defendants have moved for summary judgment on all counts, and Plaintiffs have moved for summary judgment on Count V. For the reasons stated below, Defendants' motion for summary judgment is granted as to Count I, and all state law claims (Counts II-V) are dismissed without prejudice. Plaintiffs' motion for summary judgment, which addressed only Plaintiffs' state law claim for replevin, is therefore stricken without prejudice.

## BACKGROUND

The relevant facts, described below, are based on the following Local Rule 56.1 statements and attachments: Dr. Corla Hawkins' Statement of Undisputed Facts ("Pl. LR 56.1 Stmt.")[2],

---

[2]     In Dr. Corla Hawkins' Statement of Undisputed Facts, Plaintiff sets forth thirty-four paragraphs of facts, but does not provide any citations to the record or any evidence in support of her assertions. (See Pl. LR 56.1 Stmt.) Under Local Rule 56.1(a), a moving party must present a statement of material facts with "short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Rule 56.1(a) further states that "[f]ailure to submit such a statement constitutes grounds for denial of the motion." While the court declines to deny Plaintiffs' motion for summary judgment solely on these technical grounds, the court will not scour the record to find support for Plaintiffs' positions. See Herman v. City of Chicago, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing.") Thus, the court will only consider the portions of Dr. Hawk's statement of facts that are material to her motion for summary judgment *and* admitted by Defendants. The majority of the unsupported statements consist of background information concerning Dr. Hawk's career as an educator, her founding of RGCA and RGCF, and her successes as the leader of RGCA and interim principal of Paderewski Elementary School, much of which is not material to Plaintiffs' motion for
(continued...)

2

Defendant Board's Response to Plaintiff's Statement of Undisputed Facts ("Def. LR 56.1 Resp."),
Defendant Board's Additional Statement of Facts ("Def. LR 56.1 Add'l Stmt."), and Defendants'
Amended Joint Rule 56.1 Statement of Undisputed Material Facts ("Def. LR 56.1 Stmt."). Local
Rule 56.1(b) requires a party opposing a motion for summary judgment to serve and file a response
to the moving party's statement of material facts. Plaintiff has not submitted a response to
Defendants' Amended Joint Rule 56.1 Statement of Undisputed Material Facts or to Defendant
Board's Additional Statement of Facts. Because Rule 56.1(b) is explicit that "all material facts set
forth in the [moving party's statement] will be deemed to be admitted unless controverted . . . [,]"
the court deems admitted all of Defendants' statements of material fact that it finds supported by
the record.

## 1. Recovering the Gifted Child Academy

In 1990, Plaintiff, then a teacher at Bethune Elementary School ("Bethune"), a Chicago
Public School, founded RGCA. (3/9/05 Hawk Dep. at 68-70, Ex. F to Def. LR 56.1 Stmt.) RGCA
was formed as a private school for the purpose of creating a separate environment for children
underachieving in the fifth and sixth grades; the school was initially operated out of Bethune under
Plaintiff's direction. (Def. LR 56.1 Stmt. ¶ 7; 3/9/05 Hawk Dep. at 68-72, 95.) In 1996, RGCA
became a Chicago Public School, complete with its own unit number and budget, but it continued
to operate out of Bethune. (Def. LR 56.1 Stmt. ¶ 8; 3/9/05 Hawk Dep. at 91-92, 95.) In 2001,
RGCA moved from Bethune to Paderewski, where, from August 27, 2001 until June of 2003,
Plaintiff acted as interim principal. (Def. LR 56.1 Stmt. ¶¶ 1, 10; 3/9/05 Hawk Dep. at 64.) As
interim principal, Plaintiff directed the day-to-day operations of both Paderewski and RGCA, which
included supervising all of the employees at Paderewski and RGCA. (Def. LR 56.1 Stmt. ¶ 12;
4/13/05 Hawk Dep. at 617, Ex. H to Def. LR 56.1 Stmt.)

---

[2](...continued)
summary judgment. (*See* Pl. LR 56.1 Stmt. ¶¶ 1-18, 21-22.)

At the time Plaintiff served as interim principal of Paderewski, she was also directing the operations of RGCF, an entity separate from RGCA that was also formed by Plaintiff. (Def. LR 56.1 Stmt. ¶ 9.) RGCF provided some funding to RGCA, but also provided funding to children all over Chicago in order to address children's basic needs such as clothing, food, shelter, and education. (*Id.*; 3/9/05 Hawk Dep. at 75-76, 102-03, 112-14.) According to Plaintiff, the funding that RGCF provided to RGCA "did not cross with what [RGCA] did during the school year," but instead provided funding for such non-school activities as sending children to summer camp. (Def. LR 56.1 Stmt. ¶ 103; 3/9/05 Hawk Dep. at 104.)

During her time as interim principal at Paderewski, the Board issued Plaintiff a formal "Warning Resolution"; according to the Board, she had exhibited "conduct unbecoming a principal." (Def. LR 56.1 Stmt. ¶ 119; 3/28/02 Warning Resolution, Ex. T to Def. LR 56.1 Stmt.) This warning, issued in March of 2002, identified a number of deficiencies in Plaintiff's performance: included among the deficiencies the Board identified were her inadequate response when she observed a teacher engaging in corporal punishment, her violation of the Board's Code of Ethics in hiring and employing two relatives, her refusal to cooperate with investigators looking into her hiring of family members, and her use of corporal punishment by throwing rocks at a student who was caught throwing rocks at another student. (3/28/02 Warning Resolution.) In this written warning, the Board informed Plaintiff that if her conduct was not corrected immediately, "it may result in [her] dismissal." (*Id.*)

## 2. Investigation of Plaintiff's Alleged Misconduct

### a. James Wilson's Allegations

In October of 2002, James Wilson, Plaintiff's son, contacted the Board's legal department and alleged various improprieties related to Plaintiff's operation of Paderewski and RGCA. (Def. LR 56.1 Stmt. ¶ 13; Wilson Dep. at 7, Ex. O to Def. LR 56.1 Stmt.) Among other things, Wilson

alleged that cheating was occurring in connection with standardized testing, that an employee had created a false pay stub for Plaintiff's daughter, and that Plaintiff and other employees had CPS property at their homes. (Def. LR 56.1 Stmt. ¶ 13; Wilson Dep. at 10-11, 23-24.) In February of 2005, Wilson wrote a statement retracting these allegations; Wilson later testified that his purpose in making the allegations was to get his mother in trouble, and that the allegations were not true but were made out of spite. (Def. LR 56.1 Stmt. ¶¶ 15-16; Wilson Dep. at 11-15.)

### b. Board of Education Investigation

Lemuel Hogue, a CPS investigator, was tasked with investigating the allegations made by Wilson. (Def. LR 56.1 Stmt. ¶ 17; Hogue Dep. at 16, 46-47, 51, Ex. J to Def. LR 56.1 Stmt.) As a part of this investigation, Hogue met with Wilson on October 18, 2002; from this meeting, Hogue had the impression that Wilson's allegations were vindictive in nature. (Def. LR 56.1 Stmt. ¶ 17; Hogue Dep. at 52-54.) Also in the early fall and winter of 2002, Hogue interviewed teachers at Paderewski and collected information concerning the allegations of cheating on standardized tests and payroll fraud at Paderewski. (Hogue Dep. at 53-55.) As a part of his investigation, Hogue visited the house of Imogene Whitfield, a Paderewski employee and then-treasurer of RGCF, in December of 2002. (Def. LR 56.1 Stmt. ¶ 19; Hogue Dep. at 56; Def. LR 56.1 Add'l Stmt. ¶ 35.) On this visit, Hogue observed gym equipment in Whitfield's garage that Wilson had alleged belonged to CPS. (Def. LR 56.1 Stmt. ¶ 19; Hogue Dep. at 57-58.) Hogue also interviewed Ernestine Woods, the parent of a Paderewski student and a representative on the Local School Council ("LSC"). (Def. LR 56.1 Stmt. ¶ 20; Hogue Dep. at 71.) Woods told Hogue that her daughter had informed her that a teacher at Paderewski had changed answers on students' standardized tests in front of the seventh grade class before taking the tests to the school's office. (Def. LR 56.1 Stmt. ¶ 20; Hogue Dep. at 74-75.)

5

Around December of 2002, Hogue also met with Angela Powell, a teacher at RGCA. (A. Powell Dep. at 80-84, Ex. L to Def. LR 56.1 Stmt.) Angela related to Hogue that, in March of 2002, Plaintiff told Angela that it would be okay if she worked from home while she was pregnant; when Angela said she needed to talk to the RGCA staff about the proposal, Plaintiff told her not to do so. (Def. LR 56.1 Stmt. ¶¶ 39, 43; A. Powell Dep. at 51-53.)[3] While Angela was working from home, she received a full paycheck, although that she was not working full days. (Def. LR 56.1 Stmt. ¶ 40; A. Powell Dep. at 63-64.) After her baby was born and Angela was on maternity leave, she noticed that her paychecks did not reflect any deduction for vacation or sick leave; when she alerted Plaintiff, Plaintiff told her "not to worry about it." (Def. LR 56.1 Stmt. ¶¶ 41-42; A. Powell Dep. at 71-73.) The tone of Angela's relationship with Plaintiff changed around August of 2002. At this time, Plaintiff informed her staff, at a meeting, that if anyone "[got] her," she would "get [them] back." (Def. LR 56.1 Stmt. ¶ 44; A. Powell Dep. at 26-27.) Plaintiff specifically warned Angela that she and her husband, Gerald Powell, would have to return a new truck they had just bought if they crossed Plaintiff in any way. (A. Powell Dep. at 27-28.)

At a meeting in early 2003, Angela admitted to Plaintiff that she had participated in the investigation Hogue was conducting. (A. Powell Dep. at 157.) Angela then began to feel pressure from Plaintiff to recant her statement to Hogue; according to Angela, Plaintiff told her that she did not have to cooperate with Hogue and that he was a phony investigator. (Def. LR 56.1 Stmt. ¶ 43; A. Powell Dep. at 156-59.) On January 24, 2003, Angela and her husband Gerald, who was the band instructor at Paderewski, were informed that their positions were being "closed." (OIG Report, Attachment 1 to Declaration of James Sullivan, Exhibit Y to Def. LR 56.1 Stmt.)

Hogue also interviewed numerous other employees, including Shirley Ewing and Margaret Olawoye, both of whom were assistant principals at Paderewski, and Otis Dunson, a teacher at

---

[3]     Because facts relating to Angela Powell's husband, Gerald Powell, are also relevant to the background of this action, the court will refer to Angela and Gerald by their first names.

Paderewski. (Def. LR 56.1 Stmt. ¶¶ 5-6, 21; Dunson Dep. at 65-66, 87-88, Ex. A to Def. LR 56.1 Stmt.; 7/21/05 Ewing Dep. at 151, Ex. B to Def. LR 56.1 Stmt.; Olawoye Dep. at 41-42, Ex. K. to Def. LR 56.1 Stmt.) While Dunson stated that he did not know of any manipulation of the standardized tests, (Dunson Dep. at 87-88), Ewing did express concern about the standardized testing procedures. She noted that one test booklet "came up missing," and that although the standardized testing manual instructed the children to mark their answers darkly, the teachers were instructed, via a memo that Ewing claims was written by Plaintiff, to have the students mark their answers with light marks instead. (7/21/05 Ewing Dep. at 149-52.)[4] Olawoye told Hogue all she knew regarding the allegation that standardized tests were missing at Paderewski, which was that she found a missing answer sheet under a table in Plaintiff's office on one occasion, and that Plaintiff instructed her to take the test sheet to the home of someone who worked in the Office of Accountability. (Olawoye Dep. at 41-44.) After conducting interviews with a number of other employees, Hogue reported his findings in writing to Defendant James Ciesil, Senior Assistant General Counsel to the CPS Board of Education. (Def. LR 56.1 Stmt. ¶¶ 6, 23; Hogue Dep. at 90-91.)[5]

### c. Office of the Inspector General Investigation

As Senior Assistant General Counsel to the Board, Defendant Ciesil's responsibilities

---

[4]     In late 2002, Defendant asserts, two memoranda purportedly from Shirley Ewing, were circulated to the teachers of RGCA; the first memo, dated December 19, 2002, discussed the fact that a lot of people disliked Plaintiff and were committed to "help [Ewing] get rid of [Plaintiff] at all costs." (Def. LR 56.1 Stmt. ¶ 45; 8/25/05 Ewing Dep. at 73, Ex. C to Def. LR 56.1 Stmt.) Another memo, dated December 24, 2002 also bore Ewing's name. (Def. LR 56.1 Stmt. ¶ 45; 8/25/05 Ewing Dep. at 85-89.) Ewing was shown these memoranda at her deposition and denied having written them, (8/25/05 Ewing Dep. at 73, 85), and Plaintiff has admitted that she does not know in fact who authored the documents. (4/11/05 Hawk Dep. at 378-82, Ex. G to Def. LR 56.1 Stmt.) Neither party has furnished copies of these memoranda for the record.

[5]     Hogue testified that certain practices at Paderewski were carried out with Plaintiff's knowledge and approval. From the limited deposition excerpt Defendants have attached, however, it is not clearly exactly which practices Hogue was referring to, and Hogue's report is not in the record before the court. (*See* Hogue Dep. at 90-91.)

include selecting the course of action in the best interest of the Board when presented with a complaint of wrongdoing by a Board employee. (Def. LR 56.1 Stmt. ¶ 106; Ciesil Decl. ¶ 4, Ex. V. to Def. LR 56.1 Stmt.). According to Ciesil, when allegations of wrongdoing are brought to his attention, he sometimes recommends that the matter be assigned to an investigator or attorney within the Board's law department, and sometimes refers the allegation to an outside entity such as the Office of the Inspector General to the Board ("OIG"). (Def. LR 56.1 Stmt. ¶ 107; Ciesil Decl. ¶ 5.) In the case of the allegations against Plaintiff, Ciesil was aware of pending Board investigations into allegations of test cheating, and knew that the OIG, an independent entity, was investigating allegations of payroll improprieties and retaliation against staff cooperating in the ongoing investigation. (Ciesil Decl. ¶ 10.)[6] In early 2003, the OIG interviewed a number of Paderewski employees, including Olawoye and Dunson. (Def. LR 56.1 Stmt. ¶ 20; Dunson Dep. at 29-30; Olawoye Dep. at 63-64; OIG Report.) No one from the OIG consulted with Ciesil about the progress of the investigation prior to the issuance of the OIG's findings. (Def. LR 56.1 Stmt. ¶ 6; Ciesil Decl. ¶ 6.) And, prior to the filing of this suit, Ciesil never communicated in any manner with Olawoye or Dunson regarding Plaintiff. (Def. LR 56.1 Stmt. ¶¶ 110-11; Ciesil Decl. ¶¶ 8-9.)

When interviewed by the OIG, Dunson advised the OIG that Plaintiff had asked him to assist her daughter, Lynne Taylor, in setting up a template for paystubs to use in her beauty shop business, and had substituted Taylor's name for his on a paystub to create a sample for her. (Def. LR 56.1 Stmt. ¶ 30; Dunson Dep. at 48-53.) Wilson had previously alleged that Taylor subsequently used this false paystub to obtain a car. (Def. LR 56.1 Stmt. ¶ 30; Wilson Dep. at 20.)

Olawoye advised the OIG that, in early 2002, Plaintiff told Olawoye that Marsha Haire, a new clerk at Paderewski, who arrived earlier in the morning than Plaintiff and Olawoye, would be

---

[6]     The parts of the record to which Defendants have cited do not reveal when Ciesil became aware of these investigations or whether Ciesil had any role in initially ordering these investigations. (See Ciesil Decl. ¶ 10, Ex. V to Def. LR. 56.1 Stmt.)

8

"swiping" Plaintiff and Olawoye into the attendance record-keeping system each day. (Def. LR 56.1 Stmt. ¶ 31; Olawoye Dep. at 66-67.) Haire confirmed that Plaintiff gave her four Social Security numbers and directed Haire to punch them into the system that kept track of employee attendance. (Def. LR 56.1 Stmt. ¶ 32; Haire Dep. at 36-37, Ex. E. to Def. LR 56.1 Stmt.) Haire later learned, at a "class," that she should not be swiping in other employees; Haire expressed this concern to Plaintiff in Olawoye's presence, and Plaintiff responded by instructing her to stop putting in Olawoye's Social Security number, but to continue to punch numbers in for other employees, including Plaintiff herself. (Def. LR 56.1 Stmt. ¶ 33-34; Haire Dep. at 46-47.)

The OIG report details a number of other interviews that the OIG conducted regarding claims of Plaintiff's misconduct. The OIG interviewed Angela and Gerald Powell and learned that, at Plaintiff's direction, Angela was paid without using benefit days during her maternity leave and that Plaintiff instructed Gerald to swipe Angela into work when Angela was working from home. (OIG Report.) The OIG investigator also spoke directly with Haire who acknowledged that she was, in fact, swiping other people into work at Plaintiff's direction, and that Plaintiff had directed her to swipe Imogene Whitfield into work, although he was rarely in the building. (*Id.*) Plaintiff ultimately recommended that Haire be terminated because of malfeasance related to the payroll, and Haire subsequently wrote letters to "Labor Relations," and her "union rep" to complain that she was being investigated for payroll fraud in retaliation for writing a letter reporting "things that [Plaintiff[] had [her] do illegally." (Def. LR 56.1 Stmt. ¶ 37; 4/11/05 Hawk Dep. at 325, Ex. G to Def. LR 56.1 Stmt.; Haire Dep. at 69-70.)[7] Haire also told the OIG that, in June of 2002, Plaintiff showed her that the school's budget had a positive balance and instructed Haire to pay five employees overtime as "monetary rewards." (OIG Report.)

---

[7]       Again, because Defendants have submitted limited deposition excerpts, it is not clear when Plaintiff recommended that Haire be terminated or what letter Haire was referring to in her testimony.

Based on these and other interviews, interviews with Plaintiff, and a review of time records and attendance reports, the OIG found that credible evidence existed to substantiate allegations of Plaintiff's misconduct. The substantiated allegations included that Plaintiff engaged in payroll fraud by allowing payments to Paderewiski employees of unearned salary and benefits, directed an employee to create a fraudulent pay stub to assist a relative in obtaining a loan, and retaliated against staff who participated in on-going investigations into Plaintiff's misconduct. (Def. LR 56.1 Stmt. ¶¶ 49-50; OIG Report.) According to the OIG's findings, among the staff retaliated against were Angela and Gerald Powell, whose positions were terminated after Angela admitted to Plaintiff that she had cooperated in the CPS investigation, and Olawoye, whose position was terminated contrary to instructions from Plaintiff's superiors, once Plaintiff learned that Olawoye was attempting to leave Paderewski. (OIG Report.)

### 3. Plaintiff's Dismissal & Subsequent Media Coverage

On April 28, 2003, the OIG's findings were submitted to Duncan. (Def. LR 56.1 Stmt. ¶¶ 3, 51; Sullivan Decl. ¶ 3.) Based on those findings, Duncan authorized the preparation of a letter to dismiss Plaintiff from her employment. (Def. LR 56.1 Stmt. ¶ 54; Duncan's Answer to Interrogatories ¶ 6, Ex. S to Def. LR 56.1 Stmt.) The dismissal letter was delivered to Plaintiff's home on Friday, June 6, 2003. (Def. LR 56.1 Stmt. ¶ 55; 4/11/05 Hawk Dep. at 415.) Duncan did not publicly disseminate the letter or share it with the media. (Def. LR 56.1 Stmt. ¶ 56; Duncan's Answer to Interrogatories ¶ 3.)

On June 6, 2003, Plaintiff discussed her dismissal with some parents of Paderewski students who called her upon learning of her dismissal. (Def. LR 56.1 Stmt. ¶ 57; 4/11/05 Hawk Dep. at 57.) Over the weekend that followed, Plaintiff was "flooded" with media inquiries about her dismissal by CNN and "[e]very TV channel, local and national"; though Plaintiff is not sure exactly how the media learned of her dismissal, she testified that it would not have been difficult for the

media to find out about her dismissal from parents. (Def. LR 56.1 Stmt. ¶¶ 58-60; 4/11/05 Hawk Dep. at 420-24.) Plaintiff shared her dismissal letter with the media. (Def. LR 56.1 Stmt. ¶ 58; 4/11/05 Hawk Dep. at 422.) "On June 7, 2003, [Plaintiff] issued a press release to Mayor Daley, President George Bush and First Lady Laura Bush, National Education Association ("NEA") President . . ., Governor Rod Blagojevich and the national media denying" the allegations contained in the dismissal letter. (4/26/05 Hawk Dep. at 497-98, 500, Ex. I to Def. LR 56.1 Stmt.) Plaintiff testified that she is not aware of anyone who believed the allegations in the dismissal letter regarding Plaintiff's financial improprieties or retaliatory acts. (Def. LR 56.1 Stmt. ¶ 67; 4/26/05 Hawk Dep. at 536.)

On June 9, 2003, Duncan was asked and responded to questions about Plaintiff's termination at a press event unrelated to Plaintiff's termination. (Def. LR 56.1 Stmt. ¶ 63; Duncan's Answers to Interrogatories ¶ 3.) Duncan also had three "brief" conversations about Plaintiff with reporters from the Chicago Sun-Times, the Chicago Tribune, and NBC/WMAQ; these reporters appeared to have knowledge about Plaintiff's termination prior to speaking with Duncan. (Duncan's Answers to Interrogatories ¶ 3.) In his conversation with reporters from the Chicago Tribune, when asked about standards for evaluating the performance of educators who are regarded as "innovators," Duncan reported stating "generally that CPS wants innovators but also wants them to be honest." (Def. LR 56.1 Stmt. ¶ 65; Duncan's Answers to Interrogatories ¶ 3.) When asked by reporters from the Chicago Sun-Times for comment about Plaintiff's dismissal, Duncan "refused to comment on the specific charges other than to say that they did not include physical harm to children." (6/10/03 Chicago Sun-Times Article, Ex. Q to Def. LR 56.1 Stmt.) At some point during his conversation with reporters, Duncan was questioned about the appropriateness of the educational programs Plaintiff instituted at Paderewski, and Duncan responded that the issue at hand was the business side of Plaintiff's job, and not her pedagogical skills. (Def. LR 56.1 Stmt. ¶ 66; Duncan's Answers to Interrogatories ¶ 3.) To the best of Duncan's recollection, he did not

11

discuss the specifics of Plaintiff's termination during his conversations with the media. (Def. LR 56.1 Stmt. ¶ 64; Duncan's Answers to Interrogatories ¶ 3.)

Vaughn, the Board's deputy press secretary, is responsible for "writing press releases, planning press conferences, media relations and drafting internal communications for the Board." (Def. LR 56.1 Stmt. ¶ 115; Vaughn Dep. at 7-8, Ex. N to Def. LR 56.1 Stmt.) In the Board's hierarchy, Vaughn's supervisors are the press secretary to the Board and, at the next level, the Board's director of communications. (Def. LR 56.1 Stmt. ¶ 115; Vaughn Dep. at 7-8.) Around June 9, 2003, Vaughn also began fielding questions from reporters about Plaintiff's dismissal; at that time, Vaughn spoke with the Board's law department, Duncan, and the OIG, and reviewed the OIG's findings. (Def. LR 56.1 Stmt. ¶¶ 115-17; Vaughn Dep. at 21-23.)[8] Vaughn confirmed that Plaintiff "was removed pending an investigation into allegations of 'financial improprieties and acts of retaliation against staff.'" (Def. LR 56.1 Stmt. ¶ 116; Vaughn Dep. at 17-18.)

### 4. Plaintiff's Post-Dismissal Employment Offers

After receiving notice of her dismissal, Plaintiff received a phone call from First Lady Laura Bush regarding a job that the White House had previously offered Plaintiff relating to the implementation of the No Child Left Behind Act; Plaintiff testified that "[t]hey really didn't want [her] to give up the idea of taking the position[,]" but Plaintiff was feeling "stressed out" after her dismissal and, because Plaintiff did not know where things were going, she did not want to be traveling and representing the White House while negative things were being said about her. (Def. LR 56.1 Stmt. ¶ 69, 71; 4/26/05 Hawk Dep. at 543-44.)[9] The First Lady suggested that Plaintiff

---

[8]     Defendants assert that Vaughn reviewed OIG's findings around April 9, 2003, but this date is not supported in the record. (Def. LR 56.1 Stmt. ¶ 53.)

[9]     In Defendants' version of the facts, the First Lady offered Plaintiff a job *after* Plaintiff was terminated, but this chronology is contradicted by Plaintiff's testimony. (Def. LR 56.1 Stmt. ¶ 68; 4/26/05 Hawk Dep. at 543-44.)

speak with Reggie Weaver, who was then the President of the NEA; Weaver came to Chicago sometime after Plaintiff's dismissal and met with Plaintiff to encourage her to take the position at the White House and not to give up on being an educator, telling Plaintiff that her "reputation precedes [her]." (Def. LR 56.1 Stmt. ¶¶ 70, 73-74; 4/26/05 Hawk Dep. at 545-46.) At the time of her meeting with Weaver, Plaintiff remained adamant that she was not going to take the position and wanted to "clear" her name. (Def. LR 56.1 Stmt. ¶ 74; 4/26/05 Hawk Dep. at 546.) Plaintiff also spoke to Governor Blagojevich after her dismissal; the Governor offered to Plaintiff that he might help her find a job, but Plaintiff assumed the job he was referring to was a "political position" and testified that she was not interested in taking on a political role. (Def. LR 56.1 Stmt. ¶¶ 75-76; 4/26/05 Hawk Dep. at 547-48.)

## 5. Name-Clearing Hearing

On July 23, 2003, Plaintiff was given notice of a name-clearing hearing in reference to the allegations that formed the basis for her dismissal; this hearing took place on July 31, 2003. (Pl. LR 56.1 Stmt. ¶¶ 29, 31; Def. LR 56.1 Stmt. ¶ 118; 7/31/03 Hearing Transcript, Ex. U. to Def. LR 56.1 Stmt.) The hearing officer was David Pickens, the deputy chief of staff for CPS. (Def. LR 56.1 Stmt. ¶ 118; 7/31/03 Hearing Transcript at 3.) The other individuals present at the hearing were Plaintiff's lawyers and two attorneys from the Board. (7/31/03 Hearing Transcript at 3.) At the hearing, Plaintiff made a statement but was not cross-examined. (Id. at 4.) Plaintiff stated that she was informed that her statements at the hearing would have no effect on her dismissal. (Id. at 4-5.) Plaintiff was given the opportunity to respond to the allegations made against her, and she took this opportunity to explain why, in her view, each allegation contained in the dismissal letter was not true. (Id. at 5-18.) After this hearing, no additional administrative proceedings occurred relating to Plaintiff's employment or dismissal. (Pl. LR 56.1 Stmt. ¶ 32; Def. LR 56.1 Resp. ¶ 32.)

### 6. Board's Retention of Property

On June 27, 2003, Plaintiff was permitted to return to Paderewski in the presence of Board officials to retrieve personal items. (Pl. LR 56.1 Stmt. ¶ 27.) Plaintiff also met Board officials at Paderewski in July of 2003 for the purpose of conducting an inventory of property at Paderewski. (Pl. LR 56.1 Stmt. ¶ 28.) This inventory was conducted in the presence of Thomas McGreal, the Coordinator of Facility Support for the Board at the time of Plaintiff's dismissal. (Def. LR 56.1 Stmt. ¶ 77; Declaration of Thomas McGreal ¶ 1, Ex. X to Def. LR 56.1 Stmt.) McGreal was responsible for assisting the new principal at Paderewski in managing the property located at Paderewski and in transferring and storing property from Paderewski. (Def. LR 56.1 Stmt. ¶ 78; McGreal Decl. ¶ 2.) During this inventory, Plaintiff and McGreal took a tour of the school and Plaintiff identified the items that she claimed belonged to her by placing a Post-It on them. (Def. LR 56.1 Stmt. ¶¶ 79-80; McGreal Decl. ¶ 3-4.) According to McGreal, many of the items identified during this inventory, such as desks and chairs, were clearly identifiable as Board property because they bore the Chicago Board of Education stencil. (Def. LR 56.1 Stmt. ¶ 81; McGreal Decl. ¶ 5.) For many years, it was the Board's practice to stencil on an item, such as furniture, before distributing the item to a particular school. (Def. LR 56.1 Stmt. ¶ 82; McGreal Decl. ¶ 6.) Because Plaintiff did not show McGreal any proof of ownership for many of the items, he declined to give her all of the items over which she claimed ownership. (Def. LR 56.1 Stmt. ¶ 83; McGreal Decl. ¶ 7.) Some of the items that Plaintiff claimed were hers were musical instruments, computers, and computer equipment. (Def. LR 56.1 Stmt. ¶ 45; McGreal Decl. ¶ 8.)

After this inventory, the items that the Board agreed did belong to Plaintiff were placed in the Paderewski gym and cafeteria. (Def. LR 56.1 Stmt. ¶ 85; McGreal Decl. ¶ 9.) On July 25, 2003, Plaintiff was permitted to return to Paderewski to retrieve property identified by the Board as belonging to Dr. Hawk or RGCF. (Pl. LR 56.1 Stmt. ¶ 30.) According to McGreal, Plaintiff took the

items she wanted and indicated that the Board could dispose of the remaining items. (Def. LR 56.1 Stmt. ¶ 86; McGreal Decl. ¶ 10.) In a May 2005 letter, Plaintiffs' attorney, Beverly Spearman, wrote to the Board's Law Department indicating the items that Plaintiffs are concerned with in their action for replevin were not among the items placed in the gym and cafeteria on July 25, 2003. (Def. LR 56.1 Add'l Stmt. ¶ 53; 5/26/05 Letter, Ex. F to Def. LR 56.1 Add'l Stmt.)[10]

During the summer of 2003, Ciesil worked with Spearman to return the property that Dr. Hawk claimed belonged to the Plaintiffs. (Def. LR 56.1 Stmt. ¶ 88; Ciesil Decl. ¶ 12.) Ciesil offered, on behalf of the Board, to return any items for which Plaintiffs could show proof of ownership. (Def. LR 56.1 Stmt. ¶ 88; Ciesil Decl. ¶ 13.) Dr. Hawk came forward with proof that, according to Ciesil, did not demonstrate that either of the Plaintiffs had an ownership interest in the computers, musical instruments, and other items they claimed; instead, they merely presented "receipts that did not identify the items purchased or the name of the purchaser." (Def. LR 56.1 Stmt. ¶¶ 89-90; Ciesil Decl. ¶¶ 14-15.) Plaintiff also claims that certain "journals" are missing, but the Board has been unable to locate any such journals. (Def. LR 56.1 Stmt. ¶ 91; Ciesil Decl. ¶ 16.) In approximately October of 2005, after Plaintiff had attempted to retrieve RGCF property through counsel several times, she was directed to meet the Board's counsel at a location "where property was stored and was advised that she could take all of the items present there whether or not it was" the Board's property. (Pl. LR 56.1 Stmt. ¶ 33.) Plaintiff declined to do so. (*Id.*)

Gerald Powell was the band and music instructor at RGCA when it was located at Bethune; later, when RGCA moved to Paderewski and Plaintiff became the interim principal, Gerald became the band instructor at Paderewski. (Def. LR 56.1 Stmt. ¶ 93; Declaration of Gerald Powell ¶ 2, Ex. W to Def. LR 56.1 Stmt.) According to Gerald, in 2000, VH-1 "Save the Music" awarded CPS

---

[10]     Plaintiff's replevin claim pertains to thousands of items. (Ex. B to First Am. Compl.) Among these items are the following: computers, books, furniture, office equipment, instruments, various animals, board games, jewelry, a set of golf clubs, a dancing Santa, and a popcorn machine. (*Id.*)

a grant of approximately $15,000-$20,000 to purchase instruments for RGCA. (Def. LR 56.1 Stmt. ¶ 95; G. Powell Decl. ¶ 6.) The money went directly to a local music store, which sent a bundle of band instruments that, after RGCA moved from Bethune to Paderewski, Gerald used for instruction at both Paderewski and RGCA. (Def. LR 56.1 Stmt. ¶ 97; G. Powell Decl. ¶ 8.) When RGCA moved to Paderewski, Plaintiff brought these instruments as well as instruments separately purchased by CPS for RGCA. (Def. LR 56.1 Stmt. ¶ 99; G. Powell Decl. ¶ 60.) In 2001, Gerald obtained a different grant of $1,600 to purchase more instruments for Paderewski. (Def. LR 56.1 Stmt. ¶ 98; G. Powell Decl. ¶ 9.) Gerald did not remove any instruments from Paderewski or RGCA when he was transferred from Paderewski in 2003. (Def. LR 56.1 Stmt. ¶ 100; G. Powell Decl. ¶ 10.)[11] Diane Ferguson, a facilitator in the Board's Office of Accountability, testified that the majority of good instruments that were at Paderewski when RGCA moved to Paderewski were instruments on loan from John M. Smyth Elementary, which did not have a band program at the time. (Def. LR 56.1 Stmt. ¶¶101-02; Ferguson Dep. at 8-10, 270-71, Ex. D to Def. LR 56.1 Stmt.)

Defendants now move for summary judgment. They contend that the undisputed facts do not support that Plaintiff was deprived of a liberty interest in her occupation by the Board, Duncan, or Vaughn, or that Board employees conspired against Plaintiff. Plaintiffs move for summary judgment on their replevin claim, arguing that the undisputed facts support that they are entitled to certain property that the Board is retaining.

## DISCUSSION

### 1. Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as

---

[11]     The circumstances of Gerald's transfer are not clear to the court, but the record indicates that Plaintiff dismissed both Gerald and his wife, Angela, on January 24, 2003. (OIG Report, Attachment 1 to Declaration of James Sullivan, Exhibit Y to Def. LR 56.1 Stmt.)

to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). When considering a motion for summary judgment, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill., 424 F.3d 659, 666-67 (7th Cir. 2005). The court need not draw every conceivable inference from the record, but only reasonable ones. Moser v. Ind. Dep't of Corr., 406 F.3d 895, 905 (7th Cir. 2005) (citation omitted). In this action, the parties present cross-motions for summary judgment on Count V (replevin); when considering such cross-motions, the court "construe[s] all inferences in favor of the party against whom the motion under consideration was made." Employers Mut. Cas. Co. v. Skoutaris, 453 F.3d 915, 923 (7th Cir. 2006) (citing Huntzinger v. Hastings Mut. Ins. Co., 143 F.3d 302, 307 (7th Cir. 1998)).

With the exception of Count V, on which the Plaintiffs have also moved for summary judgment, the court treats Defendants' motion as unopposed due to Plaintiffs' failure to file an opposition brief.[12] Plaintiffs' failure does not automatically result in a grant of summary judgment for Defendants, however. See Raymond v. Ameritech Corp., 442 F.3d 600, 608 (7th Cir. 2006) (citations omitted) ("[A] nonmovant's failure to respond to a summary judgment motion, or failure to comply with Local Rule 56.1, does not, of course, automatically result in judgment for the movant.") Defendants are still required to show that, given the undisputed facts, they are entitled to judgment as a matter of law. Id. (citations omitted); Tobey v. Extel/JWP, Inc., 985 F.2d 330, 332

---

[12] On September 6, 2006, the court set deadlines for the parties' summary judgment briefing, and notified the parties that responses to their pending motions for summary judgment would be due on October 4, 2006 and replies would be due on October 25, 2006. Plaintiffs did not file a response to Defendants' motion for summary judgment and, on February 6, 2007, the court notified Plaintiffs' counsel that Defendants' motion for summary judgment would be treated as unopposed unless Plaintiffs' counsel indicated otherwise by February 14, 2007. To date, the court has received no response from Plaintiffs' counsel, and Plaintiffs' counsel has not filed anything in opposition to Defendants' motion for summary judgment.

(7th Cir. 1993).

## 2. Count I: Liberty Deprivation Under 42 U.S.C. § 1983

Plaintiff sues the Board, Duncan, and Vaughn under 42 U.S.C. § 1983 for deprivation of liberty. In their motion for summary judgment, Defendants contend that Plaintiff was not deprived of a liberty interest in her occupation by any of these three Defendants. First, Defendants urge that the Board may not be held liable for a liberty deprivation because Plaintiff cannot establish that any deprivation resulted from the actions of a Board employee with final policymaking authority. (Def. Mem. at 3-4.) Even if Plaintiff could establish this fact, Defendants argue, there is no evidence that the Board, Duncan, or Vaughn made false statements that stigmatized Plaintiff, or that they publicly disclosed such information, causing Plaintiff a loss of other employment opportunities. (Def. Mem. at 5-10.) Defendants further claim that Plaintiff disseminated the stigmatizing charges herself, that there is no evidence that it is "virtually impossible" for Plaintiff to find new employment, and that Plaintiff has already received the remedy she would be entitled to if she were deprived of a liberty interest, in the form of a name-clearing hearing. (Def. Mem. at 7-11.) The court addresses, in turn, whether the undisputed facts support summary judgment in Defendants' favor as to Plaintiff's claims of individual liability and the Board's liability.

### a. Individual Liability

When a plaintiff claims that her government employer has infringed her liberty to pursue the occupation of her choice, the employee must show that "(1) [she] was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) [she] suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001) (citing *Head v. Chicago Sch. Reform Bd. of Trs.*, 225 F.3d 794, 801 (7th Cir. 2000); *Strasburger v. Bd. of Educ. of Hardin County*, 143 F.3d 351, 356 (7th

18

Cir. 1998); *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991)); *RJB Properties, Inc. v. Bd. of Educ. of City of Chicago*, 468 F.3d 1005, 1011 (7th Cir. 2006). As explained below, the undisputed facts show that Duncan and Vaughn did not engage in conduct that stigmatized Plaintiff, and that they did not publicly disclose stigmatizing information. Further, there is no evidence that Plaintiff suffered a tangible loss of employment opportunities as a result of Defendants' activities.

### i. Defamatory Statements & Public Dissemination

The first element—that the plaintiff was stigmatized by the defendant's conduct—requires a plaintiff to show that a public official made defamatory statements about her. *Strasburger*, 143 F.3d at 356. These "alleged defamatory statements must be false statements of fact." *Beischel v. Stone Bank Sch. Dist.*, 362 F.3d 430, 439 (7th Cir. 2004) (citing *Strasburger*, 143 F.3d at 356). True but stigmatizing statements are not defamatory; nor are "statements of opinion, even stigmatizing ones, if they do not imply false facts." *See Strasburger*, 143 F.3d at 356. Based on the facts before the court, the only statements made by Duncan or Vaughn about Plaintiff in the course of her dismissal were statements made in Plaintiff's dismissal letter, which was authored by Duncan, and statements Duncan and Vaughn made to the media in response to media inquiries. None of these statements were defamatory.

Plaintiff's dismissal letter stated that the Board had conducted several investigations into Plaintiff's conduct while she was serving as interim principal of Paderewski and that the investigations "substantiated serious acts of misconduct by [her] and individuals under [her] direction." (6/6/03 Letter.) The letter provided further details on the substantiated acts of misconduct, which included her participation in payroll fraud, directing an employee to fraudulently alter a pay stub, and unlawful retaliation. (*Id.*) Then, as to each type of misconduct, the letter provided further detail on the specific acts constituting the misconduct. (*Id.*) For example, under "payroll fraud," the letter noted that Plaintiff had directed the school clerk to pay unearned

19

"bonuses" to certain staff members at the end of the 2001–02 school year, and, under "unlawful retaliation," the letter noted that Plaintiff made false claims about and sought the discharge of individuals who assisted board investigators. (*Id.*)

It is undisputed that the Board and the OIG investigated Plaintiff's alleged acts of misconduct and that, in the OIG report, the OIG concluded that "credible evidence" existed to substantiate allegations that Plaintiff had committed in payroll fraud, had directed an employee to fraudulently alter a pay stub, and had unlawfully retaliated against staff who participated in on-going investigations into Plaintiff's misconduct. (Def. LR 56.1 Stmt. ¶¶ 49-50; OIG Report.) It is also undisputed that, in the OIG's view, the investigation substantiated the specific examples of misconduct outlined in Plaintiff's dismissal letter, including, among other claims, that Angela Powell was fired for cooperating with the CPS investigation into Plaintiff's conduct, that Haire had been instructed by Plaintiff to swipe other employees into the time entry system, that Plaintiff caused Dunson to prepare a false payroll document, that Plaintiff improperly terminated Olawoye's position, and that Plaintiff improperly paid four employees for undocumented time. (*See* OIG Report.) Plaintiff disputes these allegations, but her failure to respond to Defendants' Rule 56.1 submissions leave them unrebutted. Because the statements in Plaintiff's dismissal letter are therefore presumed true, they are not defamatory. *See Strasburger*, 143 F.3d at 356.

The undisputed evidence also supports the truth of the statements made by Duncan and Vaughn to the press in the aftermath of Plaintiff's dismissal. The only statements attributed to Duncan that have been brought to the court's attention are Duncan's statement in his conversation with reporters from the *Chicago Tribune* "that CPS wants innovators but also wants them to be honest," his statement to reporters from the *Chicago Sun-Times* that the charges against Plaintiff "did not include physical harm to children," and his statement to reporters that Plaintiff's dismissal related to the business side of her job and not her pedagogical skills. (Def. LR 56.1 Stmt. ¶¶ 65-66;

Duncan's Answers to Interrogatories ¶ 3; 6/10/03 *Chicago Sun-Times* Article.) Plaintiff has not raised any dispute as to the truth of these statements. To the extent Duncan's statement to the *Chicago Tribune* implied that Plaintiff was not an honest employee, the OIG's substantiated allegations that Plaintiff directed payroll fraud at Paderewski support the truth of that statement. As for Duncan's other statements, Plaintiff's dismissal letter and the OIG report, which supported her dismissal, make no mention of any physical harm to children. Likewise, these documents demonstrate that Plaintiff's dismissal was related to the business side of her job, for example, her treatment of employees and management of the payroll; nothing in these documents or elsewhere in the record indicates that Plaintiff's dismissal was related to her pedagogical skills.

The only specific statement before the court that is attributed to Vaughn is his confirmation for the press that Plaintiff "was removed pending an investigation into allegations of 'financial improprieties and acts of retaliation against staff.'" (Def. LR 56.1 Stmt. ¶ 116; Vaughn Dep. at 17-18.) The OIG report and Plaintiff's dismissal letter confirm that Plaintiff's removal was, in large part, the result of an investigation into allegations related to financial improprieties and acts of retaliation against staff. (OIG Report; 6/6/03 Dismissal Letter.) The court acknowledges that Vaughn's choice of words was somewhat confusing. Vaughn stated that Plaintiff's removal was "*pending* an investigation[,]" but the dismissal letter was clear that Plaintiff's termination was final; the letter indicated that Plaintiff would be contacted by Human Resources regarding her post-employment benefits and referred to the investigations in the past tense, implying that any investigations were completed. (*See* 6/6/03 Dismissal Letter.) But, even if Vaughn's statement could be interpreted to leave open the possibility that the investigations were not yet conclusive as to the allegations against Plaintiff, it cannot be said to stigmatize Plaintiff. If anything, Vaughn cast Plaintiff in a more favorable light than warranted, given that the investigations had, in the OIG's view, substantiated the allegations against Plaintiff. The undisputed facts do not support that Duncan or Vaughn made

21

any defamatory statements about Plaintiff, therefore they cannot be held liable under § 1983 for depriving Plaintiff of a liberty interest.

Because Duncan and Vaughn did not make stigmatizing statements, Plaintiff will be unable to satisfy the second element necessary to hold these individuals liable for a liberty deprivation—that the Defendants publicly disclosed stigmatizing information. *See Townsend*, 256 F.3d at 669-70. While it is true that Duncan and Vaughn spoke with the media, as the court just explained, they did not make stigmatizing or defamatory statements in their conversations with the media. Further, it is undisputed that Duncan did not publicly disseminate Plaintiff's dismissal letter or share it with the media. (Def. LR 56.1 Stmt. ¶ 56; Duncan's Answer to Interrogatories ¶ 3.) Finally, it is worth noting that it was Plaintiff herself who spread the news of her dismissal. Plaintiff admitted that she discussed her dismissal with some parents of Paderewski students on the day of her dismissal, that she disseminated her dismissal letter to the media, and that she issued a press release to the national media regarding her dismissal and the allegations in the dismissal letter. (Def. LR 56.1 Stmt. ¶¶ 57-58; 4/11/05 Hawk Dep. at 57, 422; 4/26/05 Hawk Dep. at 497-98, 500.)

### ii. Loss of Employment Opportunities

Even if Vaughn and Duncan publicly disseminated stigmatizing information about Plaintiff, "mere defamation coupled with firing" is not sufficient to show a deprivation of liberty. *Townsend*, 256 F.3d at 670 n.9 (citing *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987)). In fact, "mere defamation by the government does not deprive a person of 'liberty' . . . even when it causes 'serious impairment of [one's] future employment.'" *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) (quoting *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)). Rather, in order to prove that the government has infringed on her liberty interest to pursue her occupation, Plaintiff must show that her "good name, reputation, honor or integrity [were] called into question in a manner that

makes it *virtually impossible* for [her] to find new employment" in her chosen field. *See RJP Properties, Inc.*, 468 F.3d at 1011 (citing *Townsend*, 256 F.3d at 670); *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) (citing *Townsend*, 256 F.3d at 670) (emphasis added); *see also Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1349 (7th Cir. 1995) (citing *Ratliff v. City of Milwaukee*, 795 F.2d 612, 625 (7th Cir. 1986)) (stating that "some stigma attaches which affects future employment opportunities" whenever an employee is involuntarily terminated, but that is not enough to prove a deprivation of liberty).

The undisputed facts here show that Plaintiff had at least one prestigious job opportunity in her chosen field—education—available to her after her dismissal. The First Lady offered Plaintiff a job in the White House to help implement the No Child Left Behind Act before Plaintiff was dismissed and, after learning of Plaintiff's dismissal, the First Lady unequivocally expressed to Plaintiff that she still wanted her to take the job. (Def. LR 56.1 Stmt. ¶¶ 69, 71; 4/26/05 Hawk Dep. at 543-44.) In connection with this job offer, the President of the NEA, Weaver, even traveled to Chicago to meet with Plaintiff to encourage her to accept the job; during this meeting, Weaver also encouraged Plaintiff not to give up on being an educator, and told Plaintiff that her "reputation precedes [her]." (Def. LR 56.1 Stmt. ¶¶ 70, 73-74; 4/26/05 Hawk Dep. at 545-46.) In the court's view, this statement, made by a leader in Plaintiff's field, and the prestigious job offer from the First Lady, indicate that the events and statements surrounding Plaintiff's dismissal did not call into question Plaintiff's "good name, reputation, honor or integrity . . . in a manner that ma[de] it *virtually impossible* for [her] to find new employment" in her chosen field. *See RJP Properties, Inc.*, 468 F.3d at 1011 (citing *Townsend*, 256 F.3d at 670). Plaintiff's testimony that she is not aware of anyone who believed the allegations in the dismissal letter regarding her alleged financial improprieties or retaliatory acts, (Def. LR 56.1 Stmt. ¶ 67; 4/26/05 Hawk Dep. at 536), only confirms for the court that Plaintiff cannot establish that her "good name, reputation, honor or integrity" have

been called into question so as to make it "virtually impossible" for her to secure employment as an educator. *See RJP Properties, Inc.*, 468 F.3d at 1011 (citing *Townsend*, 256 F.3d at 670).

For the reasons explained above, the record does not support a constitutional violation and the court has found no disputes of fact material to this determination. The court is therefore satisfied that Defendants Duncan and Vaughn are entitled to judgment as a matter of law on Plaintiff's § 1983 claim.[13]

### b.    Board's Liability

In order to recover from the Board, an agency of municipal government, under § 1983, Plaintiff must establish that the alleged liberty deprivation resulted from either: "(1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority." *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002) (citing *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127(1988); *Monell v. Dep't of Soc.*

---

[13]    Because Plaintiff cannot support a liberty deprivation, the court need not consider whether any alleged deprivation occurred without due process of law. *See Doyle*, 305 F.3d at 617 (noting that the plaintiffs had adequately alleged a liberty deprivation, and then considering whether the deprivation occurred without due process). The court notes, however, that it is undisputed that Plaintiff has already been afforded a name-clearing hearing, the remedy to which she would be entitled if she prevailed on her liberty interest claim. *See Codd v. Velger*, 429 U.S. 624, 627 (1977) (stating that if all of the elements necessary to make a claim of stigmatization are met, the remedy under the Due Process Clause of the Fourteenth Amendment is an "'opportunity to refute the charge[,]'" which allows the person an opportunity "'clear his name'") (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 573 & n.12 (1972)); *Strasburger*, 143 F.3d at 356 (citing *Codd*, 429 U.S. at 627) ("[T]he remedy available to a discharged employee who proves all the elements of the cause of action is a name-clearing hearing."). In essence, a name-clearing "hearing demands that the person have the right to support his allegations by argument, however brief, and if necessary, by proof, however informal." *See Endicott v. Huddleston*, 644 F.2d 1208, 1216 (7th Cir. 1980) (citing *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978)). During Plaintiff's hearing, she was accompanied by her attorneys and she was given, and took advantage of, the opportunity to respond to each of the allegations related to her dismissal. (*See* 7/31/03 Hearing Transcript at 5-18.)

*Servs. of City of New York*, 436 U.S. 658, 691-94 (1978). According to the Board, the record reveals no evidence of an express Board policy or a widespread practice of publicizing defamatory statements about an employee incident to her dismissal. (Def. Mem. at 4.) Thus, the Board argues, Plaintiff must establish that her alleged deprivation was caused or ratified by a person with final policymaking authority. (*Id.*) According to the Board, the undisputed facts are clear that Plaintiff cannot make such a showing. (*Id.*) The court agrees that the record does not support the existence of an express Board policy or a widespread practice of publicizing defamatory statements about an employee incident to her dismissal.

The only Board employees that Plaintiff alleges deprived her of a liberty interest are Duncan and Vaughn. Even assuming that both Duncan and Vaughn were final policymakers under state law, Plaintiff would nevertheless have to prove the substantive elements of a liberty deprivation; in other words, that either Duncan or Vaughn deprived her of a liberty interest by engaging in conduct that stigmatized Plaintiff, and publicly disclosed stigmatizing information about Plaintiff so as to make it "virtually impossible" for Plaintiff to secure employment in her chosen field. *See Townsend*, 256 F.3d at 669-70. As explained in detail above, the undisputed facts do not support that either Duncan or Vaughn deprived Plaintiff of a liberty interest. (*See supra* Section 2.a.) As a result, the court has no basis upon which to conclude that the Plaintiff could recover from the Board under § 1983 for an alleged deprivation of liberty. Summary judgment in favor of the Board on Count I is granted.

### 3.    State Law Claims

In view of the courts' finding above that Defendants are entitled to summary judgment on Plaintiff's claim under 42 U.S.C. § 1983, this court declines to exercise jurisdiction over Counts II-V. All of these remaining counts involve state law claims: conspiracy to have Plaintiff terminated (Count II), conspiracy to intentionally inflict emotional distress (Count III), conspiracy to interfere

with Plaintiff's employment relationship (Count IV), and replevin (Count V). "It is the well-established law of [the Seventh Circuit] that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 896 (7th Cir. 2001) (citing 28 U.S.C. § 1367(c)(3)) (confirming that the court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it had original jurisdiction). Nothing in the record before the court indicates that "the interests of judicial economy, convenience, fairness, or comity" counsel in favor of this federal court determining Plaintiffs' state law claims after having dismissed the sole federal claim. *See Wright v. Associated Ins. Co.*, 29 F.3d 1244, 1251 (7th Cir. 1994) (citation omitted). Thus, the court exercises its discretion to decline jurisdiction over Plaintiffs' state law claims. Counts II-V are dismissed without prejudice.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (52) is granted as to Count I. The court dismisses Counts II-V without prejudice. Plaintiffs' motion for summary judgment (60) is stricken without prejudice.

ENTER:

Dated: March 16, 2007

REBECCA R. PALLMEYER
United States District Judge

26